# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY D. LEISER,

Plaintiff,

v.

OPINION & ORDER

DR. JOAN HANNULA, et al.,

15-cv-328-slc

Defendants.

---

*Pro se* plaintiff Jeffrey Leiser is proceeding in this lawsuit on Eighth Amendment and state law claims against several current and former Wisconsin Department of Correction (DOC) employees for their alleged failure to respond properly to his requests for treatment of his spinal and testicle pain. Before the court are defendants' motions for summary judgment (dkts. 75, 81), defendants' motion to strike Leiser's proposed findings of fact (dkt. 114), Leiser's Motion to Compel (dkt. 74), Leiser's objection to my denial of his request for default judgment as to defendant Tricia Thacker (dkt. 73), and Leiser's Motion to Appoint Expert (dkt. 124).

For the reasons stated below, I am denying Leiser's motions, and I am granting in part and denying in part defendants' motions. Based on this outcome and as foreshadowed in my August 31, 2017, text-only order, I will recruit counsel to represent Leiser on the claims that remain. As a result, I am striking all remaining deadlines, to be reset at a telephonic conference once counsel has been recruited.

## Leiser's Motion to Strike (dkt. 114)

Defendants ask that I strike plaintiff's Proposed Findings of Fact. (Dkt. 114.) Defendants correctly point out that Leiser has not filed his own motion for summary judgment,

and in any event, his proposed facts are largely conclusory and argumentative. In this situation, I am granting the motion in part and denying it in part. I have not fully incorporated Leiser's proposed findings of fact because Leiser has not moved for summary judgment. However, I will not strike them completely from the record because Leiser has responded to many of defendants' proposed findings of fact by citing to his own proposed findings of fact and the attached documents. These citations have been helpful to determining whether there are genuine issues of material fact, particularly where Leiser asserts a fact drawn from his own experience. To be clear, I have *only* considered Leiser's proposed findings of fact that he has cited to in response to defendants' proposed facts.

**Leiser's Motion to Appoint Expert (dkt. 124)**

Leiser seeks appointment of an expert to opine on his medical claims, in particular pointing out that an expert is necessary to support his claims and that he and his family have failed in their efforts to secure an expert on their own. While a plaintiff's expert might be appropriate and useful at trial, I am denying this motion because I have determined, *sua sponte*, to recruit a volunteer attorney to represent Leiser a trial. It will be up to that attorney to determine the base approach to future proceedings in this lawsuit.

**Leiser's Motion to Object to Denial of Default Judgment (dkt. 73)**

Leiser seeks reconsideration of my denial of his request for default judgment as to Thacker. On April 25, 2017, I denied Leiser's motion because "Thacker filed an answer on June 15, 2016 (*see* dkt. 30), fulfilling her obligation under Rule 55(a) to plead or otherwise defend

against the claims in plaintiff's complaint." (Dkt. 72.) Leiser cites no law or fact suggesting that this was incorrect. Accordingly, I am denying his motion for reconsideration.

**Leiser's Motion to Compel Discovery (dkt. 74)**

Leiser has filed a motion to compel better discovery responses from Tricia Thacker. He seeks more specific responses to his requests for admissions, documents related to the contract between Guardian Health Staff, LLC, and the State of Wisconsin, and Guardian's policies and procedures for employees.

Thacker responded by indicating that she updated her discovery responses to Leiser once she reviewed his medical records, but she does not have access to any documents related to Guardian because she was a contract worker at SCI for only six months and never possessed those documents. Leiser persists, arguing that Thacker could call Guardian to obtain the documents; Thacker, however, is not obliged to take this step. Thacker's responsibility under the discovery rules is to provide the documents that she possess or controls not to search for and seek documents from other people or entities. Leiser does not suggest that Thacker has failed to provide the information that she actually possess or controls, so I am denying his motion to compel.

**Defendants' Summary Judgment Motions (dkts. 75 and 81)**

## I.    The Parties

From October 28, 2010, until July of 2016, Leiser was an inmate at Stanley Correctional Institution (SCI). Leiser now is incarcerated at the New Lisbon Correctional Institution (NLCI).

The following defendants are current or former SCI employees: Dr. Joan Hannula, a physician; July Bentley, a nurse practitioner; Tracy Brunner, and Patty Hazuga, all registered nurses. Sandra DeMars, Christine McCall and Jeanie Ann Voeks all were registered nurses who served as nursing supervisors in SCI's Health Services Unit (HSU) during the relevant time period.

Nursing supervisors manage health care services, develop procedures, monitor nursing practices and record-keeping, and assist in resolving inmate complaints related to medical issues.

Defendant Tricia Thacker, a registered nurse, was employed by a professional staffing service that assigned her to work at SCI during the relevant time period.

Defendant Lon Becher was not located at SCI. Rather, in 2013, he became the Health Services Nursing Coordinator for thirteen DOC institutions, including, SCI. Becher, a registered nurse, was responsible for coordinating and overseeing health services provided at

DOC facilities, which included reviewing inmate complaints involving medical issues unrelated to actual treatment or care.

## II.    Leiser's Conditions and Their Treatment

Leiser was an inmate at SCI from October 28, 2010 until July 2016.  Leiser arrived at SCI with a history of back problems. He had undergone two failed lumbar fusion surgeries to address L5-S1, one in 1996 and a second in 2003. Leiser had a history of a herniated disc at T8-T9 that did not involve either radiculopathy (a disease that may involve a pinched nerve) or myelopathy (a neurologic problem related to the spinal cord). In 2010, Leiser underwent surgery again, at that point to fuse C6-C7.

SCI's health services providers, including the defendants, were aware of Leiser's back and consistently worked with him to address his requests for care.  Leiser was not satisfied with the treatment choices made. Leiser's relevant treatment history follows, with the parties' material points of dispute set out in italics:

**January 20, 2010:** Leiser underwent an MRI of his cervical and thoracic spine, which covered his neck and mid-back areas. The narrative report states:

> Central subligamentous disc herniations at T7-T8 and T8-T9 levels causing mild impingement on the anterior right aspect of the spinal cord although this doesn't appear to cause significant impingement upon the lateral recesses at these levels.

(Dkt. 93-1, at 794-94.)

**April 21, 2010:** A neurosurgeon at the University of Wisconsin Hospital and Clinics (UWHC) examined Leiser and recommended anterior fusion and discectomy at C6-C7 (the neck area). He also recommended that Leiser receive Vicodin, an opioid pain medication, until surgery was scheduled. (Dkt. 93-1, at 326.)

**June 9, 2010:** Leiser underwent a cervical spine fusion and discectomy at C6-C7 at UWHC.

**November 4, 2010:** Dr. Hannula examined Leiser for the first time, when he reported trapezius (shoulder) muscle spasms and residual hand numbness from the June 2010 surgery. Hannula recorded Leiser's weight at 304 pounds and noted that his upper strength and gait was normal despite walking with a cane. In Leiser's progress notes, Hannula ordered a physical therapy evaluation and an adjustment to his diet. Hannula advised Leiser to lose 25-50 pounds to help with the disc pain. Dr. Hannula noted Leiser's pain management regimen, which included heat and ice, behavioral therapy for stress reduction, a brace, non-impact aerobic exercise, a TENS unit, and anti-inflammatory medication.

**January 3, 2011:** Dr. Hannula saw Leiser for pain that radiated from his shoulders to his knees, and noted that he told her that that he was awaiting physical therapy, walked the track when the weather permitted, and used a glider or bike in the gym. *Leiser claims that he told Hannula that he could not ride the bike because it caused numbness in his testicles and that his legs give out because of the pain. (Leiser Decl., dkt. 103, ¶ 37.)*

Hannula wrote that Leiser did not exhibit pain behavior and did not walk as though he was trying to avoid pain. Dr. Hannula noted that she told Leiser that complete resolution of his pain was impossible because he had chronic degenerative disc disease, and that the DOC did not permit the long-term use of narcotics. Dr. Hannula stopped the medications Leiser that no longer wanted, prescribed ketoprofen, a non-steroidal anti-inflammatory drug, gave him an abdominal binder to help with his discomfort, and advised him to stay active.

**February 15, 2011:** Leiser had requested a second mattress to provide additional support to help deal with his back pain. Voeks, the acting HSU manager, denied his request

because prison policy only permitted double thick mattresses when an inmate suffered from severe disabling degenerative joint disease, or following joint replacement surgery.

**May 28, 2011:** Leiser was taken to HSU in a wheelchair due to severe lower lumbar and leg pain, then was sent to the emergency room at Our Lady of Victory Hospital. At the emergency room, he received pain medications, including Dilaudid, IM, Flexeril (cyclobenzaprine, a muscle relaxer), and Vicodin. Hospital staff sent Leiser back to SCI recommending rest and that he "see a neurologist or neurosurgeon." (Dkt. 100-2, at 19-20.) Because it was a holiday, Dr. Hannula was not at SCI and did not see him that day.

**May 29, 2011:** Leiser reported continued severe lower back pain and other related problems. Dr. Hannula approved a 3-day prescription of Vicodin and cyclobenzaprine over the phone.

**May 31, 2011:** Dr. Hannula saw Leiser. According to Hannula, even though Leiser arrived in a wheelchair, he could ambulate and rise up on his toes and heels. (Hannula decl., dkt. 85, ¶ 26.) *Leiser claims that he could not get up on his own, Hannula did not make him stand on his toes or heels, and he yelled in pain when Hannula tried to lift his leg (Leiser Decl., dkt. 103, ¶ 32-33.)* She ordered an x-ray, physical therapy and a follow up. (Dkt. 93-1, at 78.) She also extended his cyclobenzaprine, Vicodin, and nonsteroidal anti-inflammatories prescriptions.

Dr. Hannula states that she did not order that Leiser be seen by a neurologist or neurosurgeon at the time because she felt that it was important to first obtain an x-ray to check the hardware in Leiser's spine. She felt that conservative treatment was appropriate at that point, and that Leiser was not exhibiting any neurologic signs, nor did he meet surgical criteria.

**June 2, 2011:** Bentley discontinued Leiser's Vicodin prescription, continued the cycolobenzaprine until June 28, and renewed his baclofen prescription until June 28. Baclofen is another muscle relaxer.

**June 14, 2011:** Dr. Hannula saw Leiser and noted that Leiser reported improvement following physical therapy, and that he was less stiff and moving better. Hannula prescribed indomethacin, a nonsteroidal anti-inflammatory drug, to replace ketoprofen. *Leiser claims that he never told Hannula that he was less stiff and feeling better.*

**June 28, 2011:** Dr. Hannula did not renew Leiser's prescriptions for cyclobenzaprine and baclofen because of Leiser's reported improvement and her belief that weaning Leiser off them wasn't necessary because the medications were muscle relaxants that did not have withdrawal side effects when discontinued. According to Leiser, he had been taking those medications for three years and he suffered withdrawals when he did not receive them. (Pl. decl., dkt. 103, ¶ 45.) Neither party cited Leiser's files, which show that SCI staff either ordered or dispensed Leiser cyclobenzaprine and baclofen on several occasions, beginning in November of 2010, shortly after his arrival at SCI. (*See* Def. Ex. 1000, dkt. 93-1, at 713, 719, 722, 725, 731-32, 734, 738, 746, 752, 762.) Leiser submitted an HSU request when he did not receive those medications, and Dr. Hannula told Leiser that the medications were meant for limited use only.

**August 3, 2011:** Dr. Hannula saw Leiser and noted that he had stopped taking the indomethacin because it was bothering his stomach. Leiser agreed to try capsaicin cream for his pain. DR. Hannula wrote that Leiser's gait was normal, he walked quickly, he did not display pain behaviors at the appointment or to correctional staff, and that his neuro exam was normal. Hannula noted her suggestion to Leiser that he accept the fact that he will have some

pain in his life; that the pain does not imply harm; and that she had explained to Leiser that although his 2010 MRI showed a central disc herniation at T7-T8 and T8-T9 that caused impingement, surgery was not recommended at that time.

*Leiser claims that his gait was not normal and that he walked with a cane and a limp. He further claims that correctional staff would have noted pain behaviors because of the way he walked, that he could not sit or stand for long, and that he asked to bring a pillow with him to the day room.*

**October 7, 2011:** Bentley met with Leiser and discussed his pain management. Bentley noted that Leiser complained that he did not have access to narcotics, that he could walk but limped on his left leg, and that she told Leiser that "[n]arcotic analgesics not recommended for long-term use." (Dkt. 93-1, at 73.)

**November 29, 2011:** Becher was conducting an audit at SCI, which included an interview of Leiser. During his interview, Leiser complained about his medical care. After the interview, Becher spoke with Voeks about Leiser's complaints. Leiser followed up by sending a letter to Becher. In a reply letter to Leiser, Becher noted that he had interviewed Voeks about the treatment decisions made regarding Leiser, and that he (Becher) generally agreed with the care SCI staff were providing. (Dkt. 1-23.) Becher conceded that he did not understand why Leiser's ibuprofen prescription had been decreased, and he suggested that Leiser submit an HSR or inmate complaint on this point.

**August 28, 2012:** Bentley met with Leiser and discussed his carpel tunnel, shoulder, neck, and back issues. Bentley told Leiser that she would check an x-ray to assess his alignment.

**September 18, 2012:** Bentley met with Leiser to address his neck discomfort and review his x-rays, which showed his fusion was stable. Bentley noted that Leiser asked to be given tramadol, but that she told him this was a narcotic that was going to be removed from

the DOC's list of approved drugs. Bentley increased Leiser's baclofen to 20 mg, ordered tests to be done in three months, and recommended physical therapy.

**April 29, 2013:** In the morning, Leiser was experiencing severe pain in his testicle and abdomen. He asked correctional officers contact HSU on his behalf. Defendant Thacker learned about Leiser's requests and spoke with a charge nurse, who told the correctional officer that Leiser would have to submit an HSR to be seen. (Pl. Ex. 168, dkt. 108-1.) Thacker did not have the authority to permit Leiser to be seen in the HSU without permission from a superior.

At about 3:30 p.m. that day, HSU summoned Leiser to remind him about his upcoming lab tests. When he got there, Leiser reported his testicle pain and belief that he had an infection. Bentley examined him, and another nurse diagnosed epididymitis, inflammation of part of the testicle. Leiser was prescribed ciprofloxican in case of infection, given ibuprofen, and recommended to use ice and a jock strap. Leiser did not personally interact with Thacker that day.

**May 13, 2013:** Dr. Hannula saw Leiser for his complaints of back pain that radiated into his right testicle and leg. She examined him for a hernia or epididymitis, but she did not see signs of either condition. She noted that he complained that the jock strap did not fit, so she ordered better fitting scrotal support. She ordered a follow-up visit after his upcoming scrotal ultrasound. *Leiser claims that during this appointment he asked for pain medication that worked better than the anti-inflammatory medications he was receiving, but Dr. Hannula did not prescribe anything more than two additional weeks of Cipro (an antibiotic). (Ex. 1000, dkt. 93-1, at 50.)*

**May 24, 2013:** Leiser underwent a scrotal ultrasound, which revealed no evidence of a testicular mass.

**May 25, 2013:** Leiser went to the HSU with the same cluster of symptoms, now joined by stomach pain. A nurse gave him anti-gas pills and told him that Dr. Hannula was unavailable because it was Memorial Day weekend, but would see him after the holiday. Leiser also received a testicle sling.

**May 31, 2013:** Bentley saw Leiser for right side and testicle pain. He told her that the anti-inflammatories were not helping his pain; that he had trouble sleeping, walking, and sitting; that he was hesitant to urinate and had difficulty catheterizing; and that he was wearing a scrotal support and had taken antibiotics but had obtained no relief. Bentley suggested coming off trazodone, which could be causing his urinary retention issues, and whether Leiser should start taking Flowmax. Bentley noted that Leiser asked her to prescribe less baclofen, also to address his problems with urination, so she wrote in the plan that she would wean him off baclofen over time. (Ex. 1000, dkt. 93-1, at 43.) *Leiser claims that he never made such a request.* Bentley adjusted some of Leiser's other medications, starting him on indomethacin and discontinuing meloxicam, then recommended rest and ice. She scheduled a follow up visit in four weeks.

Leiser sent McCall a complaint about this incident. McCall did not respond because she no longer worked at SCI.

**June 11, 2013:** Dr. Hannula saw Leiser for pain in his right side and in his testicle. Leiser told her that the medications were not helping. Dr. Hannula prescribed tamsulosin and referred Leiser to an off-site urologist for testing. Dr. Hannula explains that she did not prescribe narcotic pain medication to Leiser because she saw no evidence of a specific medical condition, and narcotics are not appropriate for chronic non-malignant pain.

**June 21, 2013:** Leiser underwent a urology consultation at the Marshfield Clinic, where he was diagnosed with bilateral testicular pain and lower abdominal pain with an uncertain cause. Staff recommended nothing beyond follow up as needed.

**June 25, 2013:** Bentley met with Leiser about abdominal, groin, and testicle pain. She wrote that "[o]nce labs are available, revisit recommendation for surgical consult," but also told Leiser that he may "have to come to the realization that there is idiopathic discomfort when no reasoning can be found." That day Bentley ordered salsalate for Leiser's pain, canceled his indomethacin prescription because it was not working for him, increased his tamsulosin to help treat his urinary retention, and ordered lab tests. (Dkt. 93-1, at 32.) Leiser did not receive these medications that day, so he submitted an HSR on July 8, 2013, and the medication was re-ordered that day.

**July 10, 2013:** Bentley submitted a form proposing a surgical consult for Leiser's pain, and the committee recommended a CT scan followed by a surgical consult.

**July 18, 2013:** Bentley reported that she called Leiser to HSU to discuss approval of an outside CT scan of his abdomen. She wrote that he told her that his abdominal binder was slightly helpful, and even though Leiser reported that the salsalate had not been helpful, he would continue using it. Again, Bentley wrote that they would plan a surgery consultation after the scan. *Leiser claims that he asked Bentley about seeing a neurosurgeon during this visit but she denied his request.*

**July 30, 2013:** Leiser underwent a CT scan at the Our Lady of Victory Hospital for his right lower quadrant and scrotal pain. The reviewing doctor saw no acute findings or evidence of a hernia.

**August 6, 2013:** Leiser submitted an HSR complaining of ride side and testicle pain again, and a nurse first told him to try deep breathing and relaxation techniques.

**August 7, 2013:** Bentley submitted an off-site services request form, in which she wrote that the CT scan had been completed and requested in a general surgery consult at the University of Wisconsin Health Center (UWHC).

**August 14, 2013:** Leiser saw a general surgeon, Dr. Jung at UWHC. Jung wrote in his note that he examined Leiser, as well as his history, labs and images. He wrote that "[t]here is currently no surgical indication for this man," and that the problem may be neurological but that he would defer to a spinal specialist. (Dkt. 93-1.)

**September 10, 2013:** Leiser saw Bentley, who noted that Leiser could walk with a "steady gait," that he can go from seating to standing with no difficultly, and that he walks with his "right hand resting against his right middle abdomen." *Leiser disputes this description, claiming that he was unable to walk without his cane and had a limp.* Bentley further wrote that she told Leiser that his pain was not nerve-related, told him that she "could not in good conscience offer narcotic analgesic as a solution," and that she would request Lyrica (a medication used for muscle and nerve pain) and an MRI. (Dkt. 93-1, at 28.) Bentley requested an MRI on September 25.

**September 30, 2013:** Bentley saw Leiser and they talked about how Leiser was reacting to the Lyrica, and she wrote that he saw improvement but also requested muscle rub and described his pain as starting in his "right mid back" and "traveling around to his groin." After this appointment, Bentley reported that the request was cancelled because Leiser was "doing better." (See dkt. 1-7.) *Leiser claims that he still had testicular pain.*

**November 1, 2013:** Bentley saw Leiser, who complained that he was in constant pain, with increased pain when he defecated or twisted, and that it hurt to urinate or to walk, sit or stand for more than ten minutes. Bentley explained that surgery was not a possibility because Leiser was still functional. They discussed the possibility of epidural steroid injections; Bentley agreed that she would re-request an MRI to determine if injections would be possible. They also discussed Leiser's pain medication, and she reiterated that narcotic pain medication is not a recommended long-term treatment option. (Dkt. 93-1, at 24.) Bentley's request for an MRI of Leiser's "lumbro/sacral area" was approved on November 5.

**November 26, 2013:** Leiser underwent an MRI of his lumbar (lower) spine, which Dr. Hannula had ordered. The radiology results included the impression that the degenerative disc disease was "most significant at L4-L5 with a small posterior disc protrusion and annula fissure," "mild to moderate central spinal stenosis," "mild narrowing of the lateral recesses bilaterally," and "mild bilateral neural foraminal narrowing." (Dkt. 93-1, at 213.) According to Bentley, this means that Leiser had narrowing of the spinal canal but that he was stable.

**December 16, 2013:** Bentley met with Leiser about the MRI, and she told him that surgery would not help because his pain was very focused in one area that did not include the nerves affected by the L4-L5 narrowing that could be seen on the MRI. (Bentley decl., dkt. 86, ¶ 59.) Bentley pointed out that no objective findings were made by HSU, by a urologist, or by a general surgeon. Bentley advised Leiser to continue weight loss, core stretching and strengthening, muscle rubs, acetaminophen, salsalate and levothyroxine. (Dkt. 93-1, at 20.)

**February 13, 2014:** Leiser was taken to HSU for severe right quadrant pain, and a nurse gave him a laxative but no pain medication.

**February 14, 2014:** Dr. Hannula examined Leiser because he was complaining that his skin was stinging and burning. She did not diagnose shingles but told him that his symptoms may be a precursor to shingles. She described the signs he should look for and ordered him a topical cream to address a rash if necessary.

**March 19, 2014:** Dr. Hannula saw Leiser for pain in his testicle, right side, stomach and back. Hannula wrote that there "is no specific intervention either I or the inmate can think of at this time which would be beneficial for his on going subjective complaints," and she scheduled him for follow-up every three months to run additional tests and labs (Dkt. 93-1, at 18.) She further noted that Leiser did not display pain behaviors and was "pleasant and engaging."

**June 24, 2014:** Dr. Hannula and Leiser's psychiatrist ordered a trial prescription of Cymbalta, a brand of duloxetine, which is a medication used to treat chronic pain and depression. Leiser had been taking citaloprim, another anti-depressant for almost ten years. The doctors did not wean him off citalopram because, according to Hannula, citalopram usually does not have withdrawal side effects and duloxetine has "some of the same properties" as citalopram.

**July 10, 2014:** Dr. Hannula increased Leiser's dose of duloxetine at the recommendation of Leiser's psychiatrist.

**July 18, 2014:** Leiser submitted an HSR in which he stated that he was stopping the duloxetine because it was giving him chest pains. (Compl. Ex. 108, dkt. 1-11.) Hazuga called him to HSU on July 19, and she gave Leiser a refusal of medication form to sign. She states that she did not assess him for chest pains because he did not report it. She further states that

after she received the form she shut the door to create a barrier because Leiser is a large man who can appear aggressive if upset. (Hazuga decl., dkt. 87, ¶ 14.)

*Leiser claims that he tried to tell Hazuga that he was experiencing chest pains, but that Hazuga shut the door on him without examining him or even giving him a chance to talk to her. (Pl. decl., dkt. 103, ¶ 158; PPFOF, dkt. 100, ¶ 207.)*

**July 21, 2014:** Dr. Hannula learned that Leiser was not taking the duloxetine and that he signed the form confirming that he was refusing the medication. That day she made a note that he stopped taking it.

**July 23, 2014:** The parties dispute at what hour, but sometime this day,[1] Leiser asked a correctional officer (CO) to call HSU and inform staff that he was suffering from withdrawal and wanted to resume taking citalopram. Nurse Brunner received a call from a CO, who relayed Leiser's complaints and told Brunner that Leiser was complaining of back pain and sweating.

Brunner did not consider Leiser's complaints to be an emergency. Leiser was not seen in HSU that day and was told that he would need to wait until the next day to be seen. It is unclear when, but Brunner discussed Leiser's request with Dr. Hannula, Dr. Luxford, and another nurse. Dr. Hannula told Brunner to direct Leiser to submit an HSR if he wanted to go to HSU, and to contact his psychiatrist if he wanted to restart taking citalopram. Brunner did not enter this incident in Leiser's progress notes at that time. After Leiser filed a complaint and

---

[1] Defendants' proposed fact about this incident states that Brunner received the call at 8:00 p.m. on July 23, 2014. (DPFOF, dkt. 113, ¶ 149.) However, the cited evidence, Brunner's declaration (dkt. 89, ¶ 9) and her progress note from that day (Ex. 100, dkt. 93-1, at 16), do not include the time of day. Leiser disputes this, citing to a complaint he wrote to DeMars about the incident in which he wrote that he approached the CO at 3:00 p.m., then again at 6:00 p.m., and finally at 8:00 p.m., when he was told he had to wait until the next day for treatment. (PPFOF, dkt. 100, ¶ 211; Compl. Ex. 116, dkt. 1-18.)

DeMars spoke with her, Brunner entered this incident in the progress notes, labeling it a "late entry."

At 4:00 p.m. on July 24, Dr. Luxford met with Leiser, gave a dose of citalopram and wrote that she was maintaining that prescription. (Ex. 1010, dkt. 93-11, at 18, 20.)

**August 8, 2014:** Brunner saw Leiser for back and testicle pain, and she told him that he had to learn to live with the pain. *Dr. Hannula claims that she had no involvement with this visit, but Leiser claims that he saw Brunner go talk to Dr. Hannula, who told Brunner to make an earlier appointment for Leiser, if available.* According to Leiser, Brunner did not schedule an appointment for him.

**August 28, 2014:** Dr. Hannula saw Leiser and he requested to see a neurosurgeon. Dr. Hannula told him that his MRI and clinical examination did not indicate that surgery would be helpful. She again noted that Leiser did not show pain behaviors, and was pleasant, engaging, and smiling. The two discussed Leiser's prior attempts to find an effective medication, and Hannula suggested a nerve block to relieve Leiser's testicle pain, which he agreed to try. Hannula also restarted Leiser on Gabapentin, which he had tried previously but found hurt his stomach.

**September 5, 2014:** Bentley filled out an off-site service request for Leiser to be seen at the Pain Clinic of Northwest Wisconsin for a consultation on a nerve block.

**September 22 and December 29, 2014:** Leiser had nerve blocks performed at the Black River Falls Hospital Pain Clinic.

**January 13 and 16, 2015:** Leiser submitted HSRs for his back and testicle pain by an unnamed nurse. Dr. Hannula was not involved in either visit.

### III.   Inmate Complaints

Between November 2010 and August 2014, Leiser filed many inmate complaints related to his medical treatment. The acting nursing supervisors, Voeks, McCall, and DeMars each worked with SCI's inmate complaint examiner (ICE) to review these complaints when Leiser filed them. They dismissed each of Leiser's complaints because they concluded that HSU treatment providers were meeting Leiser's medical needs.

These are Leiser's complaints relevant to his claims in this lawsuit:

### A.   SCI-2013-2679.

In November of 2010, Leiser requested a thick mattress, writing he has "severe degenerative disc disease." (Ex. 1001, dkt. 93-2, at 21.). At the time, Voeks was the nursing supervisor and served on SCI's special needs committee, which reviews inmate requests for special needs accommodations. In particular, the special needs committee has the authority to approve exceptions to Health Services Policy 300:07, which establishes the guidelines for special needs and medical restrictions for inmates.

On January 7, 2011, the Special Needs Committee denied Leiser's request for a thick mattress but approved his request for a plastic chair. (Dkt. 93-2, at 16.) According to Voeks, this decision followed Health Services Policy 300:07, which provides that "Double mattresses should not be used. Use thick mattresses only. Black or navy mattresses are considered thick mattresses. Double thick mattresses are not allowed." (Ex. 1003, dkt. 93-4, at 7.) The policy further provides exceptions to this rule, including for inmates with "severe disabling degenerative joint disease."

Voeks explains that the committee reviewed Dr. Hannula's January 3, 2011, progress note, which the committee concluded did not meet the criteria for a thick mattress because his

records did not support a conclusion that he had a severe disabling degenerative joint disease, or any other condition that would permit a thick mattress. Dr. Hannula's January 3 note included the assessment that Leiser did not display pain behavior, that he could walk with a cane, and had a "fairly good" range of motion in his neck." (Ex. 1001, dkt. 93-2, at 15.) Leiser does not dispute this, instead pointing out that on November 4, 2010, Dr. Hannula's progress note stated that Leiser suffers from "diffuse degenerative disease." (Ex. 1001, dkt. 93-2, at 13.)

The denial led Leiser to file a complaint, which ICE received on February 4, 2011. (Ex. 1001, dkt. 93-2, at 1.) ICE reached out to Voeks, who reviewed Leiser's medical file and concluded again that Leiser's special needs request had been denied because he did not meet the criteria for a medical mattress. ICE deferred to Voeks and dismissed the complaint.

**B.  SCI-2011-12653.**

On July 5, 2011, Leiser filed a complaint that Dr. Hannula had stopped Leiser's prescriptions for cyclobenzaprine and baclofen without warning, causing him to suffer from withdrawal. (Ex. 1004, dkt. 93-5.) ICE contacted Voeks about the complaint, and she reviewed Leiser's medical files related to that incident. Voeks thus would have reviewed Dr. Hannula's May 29, 2011, prescriptions for those medications after Leiser went to the emergency room for severe pain; Dr. Hannula's May 31 progress note about Leiser's improvement; Bentley's June 2 order extending the prescriptions; Leiser's June 28 HSR in which he complained to Dr. Hannula that he wasn't receiving those medications; as well as Dr. Hannula's response that "Muscle relaxers are for a limited time only. They are not intended for long term use." (Ex. 1004, dkt. 93-5, at 8-15.) Voeks concluded that Dr. Hannula's decision not to renew the prescriptions again appeared appropriate and on July 27, ICE dismissed the complaint. Leiser did not appeal the decision dismissing it.

### C.    SCI-2011-15922.

In August of 2011, Leiser submitted a complaint that Dr. Hannula refused to give him proper medication for his herniated disc in his thoracic spine. Again, ICE worked with Voeks, who reviewed Dr. Hannula's August 3, 2011, progress note that Leiser's MRI of his thoracic spine showed a herniated disc causing impingement, which the neurosurgeon concluded did not need to be addressed. (Ex. 1005, dkt. 93-, at 11.) Voeks concluded that Dr. Hannula appeared to be adequately treating Leiser, and ICE dismissed his complaint.

### D.    SCI-2011-22582.

Lesier claimed that HSU denied adequate medication for Leiser's herniated disc after Voeks denied him narcotics. On October 20, 2011, Leiser had written to Voeks, complaining that the ibuprofen that Dr. Hannula had ordered for him was inadequate. Voeks responded in a letter dated November 4, 2011, in which she noted that Leiser had had 42 encounters with HSU in the past year; that HSU has responded to and had been sensitive to his health care needs; and that the decision not to prescribe narcotics was justified because narcotics "are neither recommended, nor are they safe for long-term use. They may work temporarily, but they can cause more problems than they are worth." (Dkt. #1-15.) Voeks recommended multiple ways for Leiser to ease his pain. ICE dismissed this complaint.

### E.    SCI-2013-9660.

After his April 29, 2013, HSU visit, Leiser filed a complaint with McCall, claiming that his testicle pain was not treated as an urgent medical need. McCall reviewed Leiser's file and concluded that Leiser was receiving proper medical care because he had been prescribed ciprofloxican; had received a jock strap; had follow-up visits with a nurse and Dr. Hannula; underwent a scrotal ultrasound on May 24; and had a follow up visit on May 31. While McCall

was reviewing this complaint, Leiser sent another letter complaining about the grievance process. McCall did not respond separately to that letter because she considered it a part of SCI-2013-9660. ICE dismissed the complaint, concluding that because McCall was investigating the complaint, there was no reason to conduct a separate investigation.

### F. SCI-2013-11344.

On June 10, 2014, Leiser filed a complaint with ICE that Dr. Hannula and Bentley were ignoring his medical condition because he needed to see a urologist and he wanted more effective pain medication. Becher worked with ICE to review the complaint. Taking into account Leiser's treatment at Marshfield Clinic on June 21, 2013, and Bentley's treatment of Leiser on June 25, 2013, ICE dismissed the complaint, with Becher's concurrence that Leiser had received adequate care.

### G. SCI-2014-1766.

Leiser complained that Bentley had lied to him when she told him that his testicle pain was not caused by pinching from his herniated disc. DeMars, the nursing supervisor, reviewed Leiser's medical records with ICE. DeMars found that Bentley had met with Leiser on December 16, 2013 to review his MRI, that Bentley noted that the MRI did not suggest that surgical intervention was necessary and that Leiser had an appointment in March of 2014 with Dr. Hannula at which he could discuss his concerns. On January 24, 2014, DeMars responded to Leiser's January 16, 2014, letter in which he included the same complaints he wrote in #SCI-2014-1766. In her letter, DeMars wrote that she felt that Leiser's medical needs were being addressed appropriately. Richardson, Becher, Facktor and O'Donnell all agreed that dismissal of #SCI-2014-1766 was appropriate because Leiser's medical complaints were being addressed by HSU staff.

### H.   SCI-2014-15662.

In August of 2014, Leiser complained that he was denied medical treatment for medication withdrawal by Brunner on July 23, 2014. DeMars reviewed Leiser's medical records, talked to the nurse involved, and responded to Leiser's complaint in a note dated August 15, 2014. In it, DeMars wrote that she had reviewed Leiser's medical record, had communicated with the appropriate staff, and had found no evidence of mistreatment. (Dkt. 93-11, at 22.)

### I.   SCI-2014-15663.

On August 8, 2014, ICE received Leiser's complaint that he wrote to DeMars after Hazuga forced him to sign the refusal of medication form, and she did not respond. DeMars states that she reviewed Leiser's medical record and contacted Hazuga about the incident, and she determined that Leiser was not mistreated by Hazuga. Becher was the reviewing authority and agreed with ICE's dismissal recommendation because he saw no evidence of mistreatment.

## IV.   Leiser's Notices of Claim

Leiser filed two notices of claim with the State of Wisconsin Attorney General. He filed one on August 26, 2014, in which Leiser describes his claim as "on going" and recounted the August 2014 circumstances involving his alleged withdrawal from duloxetine involving Hazuga, and claimed that Dr. Hannula and Bentley were denying him treatment for his back injury. (Ex. 1013, dkt. 94-1.)

Leiser filed the second notice on December 13, 2016. (Ex. 1014, dkt. 94-2.) In it, Leiser described a February 11, 2016, incident where he complained to Dr. Hannula about a head injury and she did nothing.

OPINION

Leiser claims that defendants' failure to properly treat him or to intervene caused him to suffer permanent spinal injury and severe testicle pain. Defendants seek judgment in their favor on Leiser's Eighth Amendment claims because the record does not support an inference of deliberate indifference or failure to intervene. With the exception of Thacker -- who was employed by a private company -- the defendants further argue that qualified immunity shields them from money damages, and that Leiser's state law claims fail. I will address Leiser's Eighth Amendment claims first, followed by an analysis of his state law claims.

## I.     Eighth Amendment Deliberate Indifference

Prison employees violate an inmate's rights under Eighth Amendment if they are "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). For purposes of these motions, defendants concede that Leiser's claims involve serious medical needs, so I will not address that prong.[2] The question, therefore, is whether they were deliberately indifferent. Deliberate indifference is more than medical malpractice; the Eighth Amendment does not codify common law torts. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.") In particular, an inmate's, or even another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).

---

[2] Defendants reserved the right to argue that Leiser does not suffer from an objectively serious medical condition at trial.

While deliberate indifference requires more than negligent acts, it does not require a showing of purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety," or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id.* at 837; *see also Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."). A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

The court is to start its inquiry by looking at the totality of the inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs. *Petties v. Carter*, 836 F.3d at 728.  If this were the sole inquiry that governed a deliberate indifference determination, then Leiser would not survive summary judgment: the facts found above demonstrate that the defendants and their colleagues provided consistent and considered medical care to Leiser over the years in response to his ongoing reports and complaints of severe, persistent pain.  At least three judges on the Seventh Circuit have concluded that this is all the Eighth Amendment requires, *see Petties*, 836 F.3d at 734-36 (Easterbrook, Flaum and

Kanne, dissenting), and they report that the Third, Tenth and D.C. circuits currently take this approach, while the Ninth Circuit has rejected it and the First Circuit has an intra-circuit conflict. *Id.* at 736 (citations omitted).

But the majority opinion in *Petties,* subsequently parsed in *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 and at 666 (7th Cir. 2016) (Wood, CJ, concurring in part and dissenting part), is that the furnishing of some care does not automatically defeat an Eight Amended claim; the court must review the record to see if the facts permit and inference of deliberate indifference. In *Petties*, the court held that a trial was necessary to evaluate a doctor's treatment decisions, and that delays related to a prisoner's ruptured tendon, despite the fact that the prisoner received consistent medical care. 836 F.3d at 731-32. Following a rehearing *en banc*, Judge Williams wrote for the six-judge majority, reasoning that "a medical decision that has no support in the medical community, along with a suspect rationale provided for making it," could support a finding of deliberate indifference. *Id.* In the majority's view, this approach is consistent with the Supreme Court's analysis in *Estelle*, which acknowledges that deliberate indifference can manifest in prison doctors' response to the prisoner's needs. *Id.* at 727 n.1 (quoting *Estelle*, 429 U.S. at 104-05).

Within the past two months, Judge Manion offered his own critique of how far this circuit's controlling precedent on deliberate indifference claims has departed from the text of the Eight Amendment. *Lewis v. McLean*, 864 F.3d 556, 566 (7th Cir. 2017) (Manion J., concurring). Having suggested that "we should eventually return to faithfully applying the text of the Constitution," Judge Manion joined the court's opinion because it "correctly applies our controlling precedent." *Id.* Like Judge Manion, I question whether this circuit's current approach to deliberate indifference claims sets the bar high enough above medical malpractice,

but I am constrained to apply the controlling precedent, which is more favorable to Leiser than to the defendants. This is particularly true at the summary judgment stage, where Rule 56 grants the non-movant the benefit of all reasonable inferences. Accordingly, based on the record before me, a jury will have to evaluate some—but not all---of Leiser's Eighth Amendment claims against Dr. Hannula, Hazuga, Brunner and Thacker, but I will grant defendants' request for summary judgment as to Bentley.

## A. Dr. Hannula

Dr. Hannula either examined Leiser or prescribed some treatment for him on over twenty instances between when he first arrived at SCI in 2010, up until May of 2015 when he filed his complaint. In that timeframe, Leiser cannot deny that Dr. Hannula prescribed a variety of pain management options in response to Leiser's repeated complaints that he continued to suffer. That said, Leiser claims that the vast majority of Dr. Hannula's treatment decisions exhibit her deliberate indifference to his pain and suffering. Leiser's claims appear to be best categorized as challenges to: (1) Dr. Hannula's unwavering conclusion that Leiser was not a candidate for surgery and could not take narcotic pain medication on an on-going basis; (2) the veracity of Dr. Hannula's characterization in her notes about Leiser's physical state; (3) instances of delayed treatment; and (4) two instances where Leiser suffered withdrawal symptoms. With the Leiser's complaints about withdrawal symptoms, a reasonable fact-finder could not conclude that Dr. Hannula was deliberately indifferent.

### 1. Surgery and Narcotics Decisions

While Leiser challenges many of Dr. Hannula's day-to-day treatment decisions, first I will address two decisions Dr. Hannula made repeatedly that Leiser is challenging: (1) surgery

was not a feasible option, and (2) Leiser should not be taking narcotics as a regular part of his treatment plan.

Leiser ardently believes that Dr. Hannula should have ordered surgery, but the record does not establish that Dr. Hannula's refusal to recommend surgery lacked professional judgment. For one, Dr. Hannula always explained her position and agreed with Leiser that they should examine whether surgical intervention was a feasible option. Indeed, in May of 2011, she ordered an x-ray to determine whether the hardware from his surgeries was in place. In August of 2011, she reviewed Leiser's 2010 MRI of his neck and mid-back region with him and explained that even though the results showed impingement at T7-T8 and T8-T9, surgery had not been recommended. In May of 2013, even though Dr. Hannula saw no signs of a hernia, she agreed that a scrotal ultrasound would be helpful in determining the source of his testicular pain. Then, in November of 2013, Dr. Hannula agreed to order an MRI of his lower back to determine the state of his degenerative disc disease, and the radiology report did not note any problems that warranted surgery.[3]

Further, even though Dr. Hannula never recommended surgery, she took other steps to address Leiser's symptoms. In particular, she worked with Leiser to determine which pain medications were helpful and she prescribed various other non-surgical approaches to lessening

_____

[3] I reach this conclusion taking into account Leiser's submissions in support of his motion for preliminary injunction. That evidence showed that in December of 2016, Leiser underwent a second MRI of his lumbar spine and the reviewing doctor noted that it showed "severe stenosis" relating to a posterior disc, but stated that he could not perform surgery due to Leiser's obesity. (*See* dkt. 58-1, at 2.). While this evidence may support a finding that Leiser's back condition worsened between November of 2013 and December of 2016, it does not permit an inference that Dr. Hannula was deliberately indifferent back in 2013. In fact, the distinction between the 2013 MRI, where the radiology report noted "mild to moderate central stenosis" (dkt. 93-1, at 213), and the 2016 MRI assessment of "severe stenosis" lends credence to Dr. Hannula's belief that surgery was unwarranted in 2013.

his pain. At the screening stage, I noted that there were a few instances -- May 13, 2013, and March 19, 2014 – when Leiser reported pain and Dr. Hannula told him that there was nothing she could do for it. Yet Dr. Hannula's notes related to these examinations demonstrate that she did not simply tell him there was nothing he could do and send him on his way. During their May 13 appointment, Dr. Hannula examined Leiser due to his complaints of back and testicle pain, and she continued his Cipro prescription and ordered a better fitting jock strap. Leiser may not be satisfied that he did not receive stronger pain medication, but Dr. Hannula's treatment plan was tailored to Leiser's complaints and did not show that she was ignoring his symptoms or failed to respond reasonably.

Similarly, during the March 19 examination, Dr. Hannula did note that there was "no specific intervention either I or the inmate can think of at this time which would be beneficial for his on going subjective complaints." Yet after that examination she ordered additional tests and labs, and scheduled Leiser for a follow up. While she deferred further action until she received the lab results, these records support an inference that she was taking steps towards alleviating Leiser's pain. (Dkt. 93-1, at 18.)

Based on the record before me, Dr. Hannula's ultimate conclusion -- that incorporated her expertise, deferred to the recommendations of other doctors that evaluated Leiser's symptoms and MRI results, and is not contradicted by any evidence – incorporated her professional judgment in a manner that was not so clearly inappropriate to support a finding that she was deliberately indifferent. *Cf. Petties*, 836 F.3d at 733 (finding that a jury could infer deliberate indifference in doctor's refusal to agree to surgery where the doctor allegedly cited costs as a reason why surgery was not appropriate).

Leiser similarly challenges Dr. Hannula's refusal to prescribe narcotic pain medication on an ongoing basis. Yet Dr. Hannula, as well as other HSU staff, prescribed a wide variety of non-narcotic pain medications and treatments, including two nerve blocks, nonsteroidal anti-inflammatory drugs, ice and heat, weight management, physical therapy, a brace, non-impact aerobic exercise, and a TENS unit. When Dr. Hannula refused his requests for narcotics, she explained that long-term use was not appropriate, even though Leiser had been receiving them on a regular basis when he was housed at Waupun Correctional Institution. Further, while Dr. Hannula told Leiser that his back condition would always cause him some pain, she continued to make efforts to lessen that pain. When Leiser reported that one anti-inflammatory drug was not working, Dr. Hannula suggested that he try another. And on a few occasions when Leiser was reporting more pain than normal, Dr. Hannula prescribed stronger medications in the form of muscle relaxers and Vicodin for temporary relief. While Leiser would have preferred narcotic pain relief, Dr. Hannula's decision not to consistently prescribe him narcotics appears reasonable *See Burton v. Downey*, 805 F.3d 776, 786 (7th Cir. 2015) (affirming grant of summary judgment to defendants where a doctor provided "a reasonable medical explanation" for his refusal to prescribe narcotics).

Accordingly, Leiser has no deliberate indifference claim against Dr. Hannula related her refusals to recommend surgery or prescribe narcotics.

## 2. Challenges to the Veracity of Dr. Hannula's Notes

There are number of instances where Leiser claims that Dr. Hannula's notes did not accurately reflect the pain he was experiencing, but none of these claims warrants a trial. Rather, taking Leiser's version of how he presented as true, Dr. Hannula's treatment decisions on each occasion sufficiently addressed Leiser's complaints of pain.

In particular, on January 3, 2011, Dr. Hannula noted that Leiser told her that he was able to use a bike for exercise, but Leiser claims that he told her that he was unable to ride a bike because it was too painful. Yet Hannula did not ignore his complaints: she changed his medication, gave him an abdominal binder, and advised him to stay active. Similarly, on May 31, 2011, Dr. Hannula noted that Leiser arrived to an appointment in a wheelchair but able to walk on his own and rise up on his toes and heels. Leiser claims he couldn't perform either of these tasks and actually yelled out in pain, but he doesn't dispute that Dr. Hannula's ordered an x-ray, physical therapy and a follow-up appointment, and permitted Leiser to continue taking cyclobenzaprine, Vicodin, and nonsteroidal anti-inflammatories. On June 14, 2011, Dr. Hannula wrote that Leiser reported improvement in his low back pain following physical therapy, but Leiser claims that he never told her he was feeling better. Again, Dr. Hannula attempted to address his pain by prescribing Leiser a new anti-inflammatory drug, indomethacin, to replace ketoprofen.

Finally, on August 3, 2011, while Dr. Hannula wrote that Leiser's gate was normal and that he walked quickly, Leiser claims that he walked with both a cane and limp. Regardless, during that visit, Dr. Hannula reviewed Leiser's MRI with him, acknowledged that he was in pain, and explained to him that because of his condition, he should consider accepting that he would have pain throughout his life. She also prescribed him a trial of capcaicin for his pain. Even making every assumption in Leiser's favor as to how he presented and reported his pain, Dr. Hannula's treatment plan was not so flawed that it would support an inference that she was not employing her professional judgment.

### 3. **Delay**

There were a few instances of a delay between when Leiser complained to Dr. Hannula about pain and when she examined him. A delay in treatment can constitute deliberate indifference when the delay worsens the condition or where the desired treatment is not particularly burdensome to provide. *See Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir. 2008) ("A delay in the provision of medical treatment for painful conditions – even non-life-threatening conditions – can support a deliberate-indifference claim."). While Dr. Hannula agrees that she did not personally examine Leiser on two days that he requested treatment, there was actually no delay in treatment that worsened Leiser's condition.

On May 28, 2011, Dr. Hannula was out for Memorial Day and thus unable to see Leiser when he went to the HSU for severe lower back and leg pain. Yet Leiser cannot deny that he received treatment that day. Indeed, HSU staff sent him to the emergency room, where he received a number of extremely potent medications, including cyclobenzaprine, Vicodin and Dilaudid. The next day, when Leiser continued to report severe pain, Dr. Hannula approved a 3-day prescription of Vicodin and cyclobenzaprine. Dr. Hannula examined Leiser on May 31, at which point she ordered an x-ray and physical therapy and continued him on cyclobenzaprine, Vicodin, and non-steroidal anti-inflammatories. Because Dr. Hannula's absence from SCI on May 28 did not leave Leiser without treatment, and Dr. Hannula provided prompt treatment upon her return from vacation, there is no evidence supporting a finding that any decision by Dr. Hannula worsened Leiser's condition.

Two years later, on May 25, 2013, Leiser submitted an HSR about his testicle and stomach pain and did not see Dr. Hannula that day because it was Memorial Day weekend. However, Leiser has not established that Dr. Hannula knew about this request and failed to

act. And regardless of whether Dr. Hannula knew about it, that day Leiser received treatment from a nurse in the form of anti-gas pills and a testicle sling. As such, there is no evidence that Dr. Hannula's absence from SCI that day worsened Leiser's condition.

### 4. Withdrawal

Finally, on two occasions Leiser contends that Dr. Hannula made a prescription decision that caused him to suffer withdrawal symptoms. While Dr. Hannula insists that none of the medications she stopped prescribing could cause withdrawal symptoms, a jury will have to evaluate these two treatment decisions to determine whether she abandoned her professional judgment.

First, following Leiser's May 28, 2011, visit to the emergency room for an acerbation of his lower back and leg pain, emergency room providers and Dr. Hannula prescribed Leiser both cyclobenzaprine and Vicodin to treat a flare-up of his back pain. Leiser was also taking baclofen at the time. However, after Dr. Hannula examined him on June 14, she did not renew his prescriptions for cyclobenzaprine and baclofen, which were scheduled to end on June 28. Leiser claims that he needed to be weaned from cyclobenzaprine and baclofen because he had been taking them for years. Dr. Hannula responds that, in her professional judgment, weaning Leiser from these medications was unnecessary. While Leiser has not submitted any evidence that directly contradicts Dr. Hannula's professional opinion that the failure to wean a patient from baclofen or cyclobenzaprine does not result in withdrawal symptoms, the record before the court requires a trial on this point.

For one, the record supports Leiser's statement that he had been receiving cyclobenzaprine and baclofen for at least several month because SCI staff either disbursed or ordered them for him on numerous occasions between November of 2010 and June of 2011.

(*See* Def. Ex. 1000, dkt. 93-1, at 713, 719, 722, 725, 731-32, 734, 738, 746, 752, 762.) Additionally, while he does not provide any details, Leiser does allege that that he suffered from withdrawal symptoms when he did not receive them.

The primary question, therefore, is whether Dr. Hannula's professional judgment suffices to allow summary judgment in her favor on this aspect of Leiser's claim. Both the record and readily available information about baclofen would permit a reasonable fact-finder to conclude that it does not.[4] For one, in May of 2013, Bentley decided to decrease Leiser's baclofen and wrote in the progress note that she would be weaning him off it over time. (*See* Ex. 1000, dkt. 93-1, at 43.) Additionally, readily available information about the proper administration of these medications suggests that baclofen requires weaning. *See Rowe v. Gibson*, 798 F.3d 622, 628 (7ᵗʰ Cir 2015) ("When medical information can be gleaned from the websites of highly reputable medical centers, it is not imperative that it instead be presented by a testifying witness."). The Mayo Clinic's website cautions patients taking baclofen as follows: "Do not suddenly stop taking this medicine. Unwanted effects may occur if the medicine is stopped suddenly. Check with your doctor for the best way to reduce gradually the amount you are taking before stopping completely." Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/baclofen-oral-route/precautions/drg-20067995 (last visited Aug. 28, 2017). That website does not include the same precaution with respect to cyclobenzaprine. Mayo Clinic, http://www.mayoclinic.org/drugs-

_____

[4] Leiser did not have the benefit of either counsel or an expert, so he offered nothing but his own opinion to challenge Dr. Hannula's professional judgment. Leiser has explained that he has been unsuccessful in securing an expert witness to support his claims. As I explained, while I will not grant Leiser's motion for appointment of an expert now, I am recruiting counsel on his behalf, who will be better equipped to retain an expert if necessary.

supplements/cyclobenzaprine-oral-route/precautions/drg-20063236 (last visited Aug. 28, 2017).

Taking into account this information, and drawing all reasonable inferences in Leiser's favor, it is possible for a jury reasonably to conclude that Dr. Hannula's decision to stop Leiser's baclofen prescription after at least several months of his continual use amounted to a complete abandonment of the proper procedures related to that prescription. *See Petties*, 836 F.3d at 729 (noting that an action that "crosses the threshold into deliberate indifference" is where a defendant fails to follow existing protocol and permitting courts to use circumstantial evidence to evaluate treatment decisions). Accordingly, a jury will have weigh Leiser's description of his withdrawal symptoms, along with whatever evidence Leiser's appointed counsel deems appropriate, against Dr. Hannula's testimony about that decision.

The second time that Leiser claims that Dr. Hannula caused him to suffer from withdrawal symptoms occurred in 2014. Specifically, on June 24, 2014, Dr. Hannula, along with Leiser's psychiatrist, switched Leiser's depression medication. Leiser had been taking one anti-depressant, citalopram, for many years, and the doctors changed his prescription to duloxetine that day. It does not appear that they discussed the change with Leiser, or conducted any sort of examination on him, before making the change.

Dr. Hannula claims that weaning Leiser off citalopram before beginning him on duloxetine was unnecessary because she believed that duloxetine was a sufficiently similar medication. However, Leiser insists that he suffered chest pains, which he attributes to the duloxetine. Leiser's adverse reaction to the abrupt change in medication does create the inference that Dr. Hannula's response to Leiser's complaints of pain was unreasonable. The Mayo Clinic advises against abruptly stopping citalopram, and lists chest pain as one of the

withdrawal symptoms. Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/precautions/drg-20062980 (last visited Aug. 28, 2017). A listed side effect of duloxetine also includes chest pains. Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/side-effects/drg-20067247 (last visited Aug, 28, 2017).

This information is helpful at this stage because Leiser was unable to submit expert testimony and the court must draw every reasonable inference in his favor. Taking the information about citalopram into account, Leiser's chest pains *could* have been the abrupt cessation of citalopram without weaning. Therefore, a reasonable fact-finder could conclude that Dr. Hannula had completely abandoned her medical judgment when she made this prescription change, especially given that all she would need to do was titrate him off the citalopram over time.

Qualified immunity does not shield Dr. Hannula from damages with respect to these two decisions. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Under Leiser's version of events, the decision to stop his baclofen and citalopram prescriptions without weaning him off completely ignored the foreseeable risks of withdrawal related to both medications and caused Leiser to suffer needless pain.

Accordingly, a jury will have to resolve Leiser's Eighth Amendment claims against Dr. Hannula related to her June 2011 and June 2014 prescription decisions.

### B.     Nurse Bentley

Bentley treated Leiser on several different occasions between May of 2013 and January of 2014, when Leiser was reporting several right side and testicle pain. She had a significant

role in responding to his treatment requests, which, according to Leiser, left him in severe pain. However, while Leiser may have been experiencing severe pain, Bentley's treatment decisions do not support an inference of deliberate indifference.

For one, on a regular basis Bentley prescribed pain medication, rest and ice, physical therapy, and special needs items such as an extra pillow, low bunk, and TENS unit. Despite her repeated attention to his complaints, Leiser claims that she was deliberately indifferent to his needs because she would not prescribe him narcotics and told him that surgery was unnecessary. However, I have not been able to find an instance where Bentley's treatment decisions suggest that she abandoned her professional judgment.

Leiser's complaints about narcotics is straightforward. For the reasons already described, given that Bentley provided other avenues for pain relief and had a solid basis upon which to deny him long-term use of narcotics, her continued refusal to provide narcotics does not support a finding of deliberate indifference.

With respect to his requests for surgery, Bentley's treatment plan actually supported his requests for surgery and did not appear unreasonable. Rather, when Leiser requested surgery, she took steps to get him a CT scan and general surgeon consult. Specifically, on July 10, she proposed a surgical consult to address his pain; on July 18, she explained to Leiser that the committee had approved a CT scan followed by a surgical consult; and on August 7, she requested a general surgery consult after Leiser's CT scan was completed. That led to Leiser's appointment with a UW doctor, who did not recommend surgery but stated that he would defer to a spinal specialist about whether his condition was neurological.

After that appointment, Leiser continued asking for a neurologist, and Bentley took steps in that direction. She requested another MRI on September 25, but on September 30,

because she examined Leiser and he reported improvement, she cancelled the MRI. Leiser claims that he still had pain at that point, but Bentley still ordered muscle rub for him, so the record does not support an inference that she was denying him care or responding in a patently inappropriate manner. Further, Bentley submitted a new request for an MRI of his "lumbro/sacral" area in November. After Leiser underwent the MRI, both Dr. Hannula and Bentley agreed that the MRI did not show that surgery was necessary. However, Bentley continued to provide Leiser a long list of options available to treat his pain and other ailments.

More importantly, Bentley never ruled out the possibility of surgical intervention. Rather, even though she did not think it was ultimately appropriate, Bentley advocated for a CT scan, a surgical consult, and an MRI, none of which indicated to her that he needed surgical intervention. Accordingly, insofar as Leiser challenges Bentley's refusal to advocate further for surgical intervention, a reasonable fact finder could not conclude that it completely lacked professional judgment. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (commenting that a prisoner may not have received the "most appropriate treatment, but a prisoner is only entitled to reasonable measures to meet a substantial risk of serious harm").

Leiser challenges a few other of Bentley's treatment decisions, but none supports an inference of deliberate indifference. For instance, on May 31, after Bentley examined Leiser for his right side and testicle pain, she decreased his baclofen, noting that Leiser had made that request. Leiser disputes that he requested less baclofen, and that he suffered needlessly for weeks following this examination. Yet Bentley justified her decision to decrease the baclofen by explaining that it could help his urination issues. Further, she did not leave him without any sort pain reliever; she continued him on a lower baclofen dosage and started him on a new medication, indomethacine. Thus, even assuming that Leiser did not request to decrease his

baclofen, he does acknowledge that he told her about his urination issues and Bentley's decision to decrease the baclofen appears to be an attempt to address that problem.

Leiser also challenges Bentley's treatment because he experienced delays. Bentley states that on June 25, 2013, she prescribed him salsalate, but Leiser claims that he did not receive it right away. However, the delay is not attributable to Bentley because it is undisputed that she put in the order that day and she has no control over the actual distribution of the medication. Given that there is no evidence suggesting that Bentley knew that Leiser was not receiving the salsalate, she cannot be held accountable for that delay.

Here, the closest call as to Bentley was her decision to cancel her initial MRI request. To the extent that this decision could constitute deliberate indifference, qualified immunity shields Bentley from Eighth Amendment liability because her assessment did not contradict any clear precedent. However, as will be described below, a jury may need to address Bentley's treatment, but under Wisconsin's negligence standard.

C. **Nurse Hazuga**

The only incident related to Hazuga occurred on July 19, 2014, when Leiser decided to stop taking duloxetine because it was causing him chest pains, and Hazuga sent him a medication refusal form for his signature. Hazuga claims that Leiser did not come to the door of the HSU with complaints of chest pains, which was why she did not examine him. For his part, Leiser claims that he tried to report his symptoms of pain to Hazuga, but she didn't give him a chance to do so because she slammed the door on him.

While Leiser does not explicitly state that he told Hazuga that he was experiencing chest pains, his version of their interaction on July 19 allows the inference that Hazuga ignored a request for treatment. Leiser claims that he tried to tell her that he was having chest pains,

but she just cut him off completely. If a jury were to believe Leiser's testimony over Hazuga's, it could reasonably conclude that she ignored his requests for medical care, especially given that he wrote on the refusal of medication form noted that he was stopping the medication because of chest pains. Accordingly, I am denying Hazuga's request for summary judgment, on both the Eighth Amendment and negligence claims.

Defendants argue that qualified immunity shields Hazuga from liability for damages, but Leiser's version of events, if believed, precludes a finding of qualified immunity because it is well established that prison officials cannot ignore a prisoner's serious health problem. Is that what happened here? It depends on whom you believe, and that makes it a jury question.

### D. Nurse Brunner

Leiser's claims against Brunner involves an incident on July 23, 2014. That day, after Leiser stopped taking duloxetine and was not taking citalopram, he was experiencing back pain and sweating, which he believed to be caused by his withdrawal from citalopram. It is unclear at what time, but at some point on July 23 Brunner learned about Leiser's complaints and responded that he needed to wait until the next morning for treatment. Instead of following up with Leiser to learn more about his symptoms or examine him herself, that day (or the next) Brunner discussed Leiser's complaints with Dr. Hannula, a nurse, and with Leiser's psychiatrist. This conversation led to Leiser's psychiatrist restarting his citalopram prescription at 4:00 p.m. the next day.

While Brunner's refusal to see Leiser on July 23 does deserve some deference, the record before the court does not support summary judgment in her favor. For one, it is unclear when Brunner learned about this request, and when she relayed Leiser's complaints to the other

health care professionals. More importantly at this stage, no one disputes that Brunner did not provide Leiser with care on July 23.

Regardless of when Brunner got the phone call, her review of Leiser's medical records would have shown that he was not taking either duloxetine or citalopram, giving credence to his report of withdrawal symptoms. While Brunner didn't deem back pain and sweating to be severe enough symptoms to require medical attention that day, a reasonable fact-finder could conclude the opposite: that Brunner's decision not to perform a simple evaluation or even lay eyes on Leiser constituted indifference. For example, it would be possible for a jury to conclude that Brunner did not exercise the minimal standard of care necessary because she did not take into account the possibility that Leiser's withdrawal symptoms could worsen or that he could suffer other, more serious citalopram withdrawal symptoms. *See* Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/precautions/drg-20062980 (citalopram withdrawal symptoms include breathing problems, chest pain, confusion, diarrhea, nausea, trembling or shaking, vision changes, vomiting). Furthermore, Brunner has not suggested that it would have been overly burdensome to examine Leiser on July 23; this could permit a reasonable fact finder to infer deliberate indifference because Brunner could have easily responded to Leiser simply by taking a few moments to look at him herself. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009) (four-hour delay could create liability where prisoner complained that an intravenous therapy was causing pain). As such, Leiser's claim challenging Brunner's refusal to respond to Leiser's request for treatment on July 23 warrants a trial.

Defendants argue that qualified immunity shields Brunner from liability. Similar to Hazuga, Brunner is not entitled to that defense because, based on Leiser's version of events,

she failed to respond to his requests for treatment, leaving him to suffer from withdrawal symptoms until the next day.

### E. Nurse Thacker

Finally, Leiser is proceeding against Thacker, claiming that on April 29, 2013, he asked to go to HSU due to severe testicle pain, and Thacker told her superior about the request, who then told the correctional officer to direct Leiser to submit an HSR if he wanted to be seen. It is undisputed that Thacker reported Leiser's complaint up the chain of command, and that Thacker did not have the authority to order that Leiser be seen at the HSU. Common sense might suggest that this would be enough to take Thacker off of the hook, but the case law is not so forgiving. Thacker's deference to the charge nurse does not absolve her of liability because "public officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior." *N.N. ex rel. S.S. v. Madison Metro Sch. Dist.*, 670 F. Supp. 2d 927, 933 (W.D. Wis. 2009).

A reasonable trier of fact could infer that Thacker should have pushed harder to get Leiser examined, so that her failure to do so amounts to deliberate indifference. Leiser was complaining that he had been enduring severe pain for several days. Even though Leiser received treatment for his testicle pain and infection that same afternoon, an unnecessary delay in treatment can amount to deliberate indifference when it "unnecessarily prolongs" the pain. *See Lewis*, 864 F.3d at 564-65 (avoidable delay in resolving plaintiff's severe back pain prevents summary judgment even if the problem is resolved later that same day); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted). Viewing Leiser's version of his experience on April 29 in his favor, it would not be unreasonable for a

jury to conclude that Thacker's failure to do more to ensure that Leiser was seen that day amounted to deliberate indifference.

Thacker has not asserted qualified immunity at this stage, so she does not receive the benefit of that defense. Accordingly, a jury will have to ferret out Leiser's claims against Thacker as well.

## II.    Eighth Amendment Failure to Intervene

Leiser is proceeding on claims that DeMars, McCall, Voeks, and Becher failed to intervene after Leiser informed them about the inadequate treatment he was receiving. An official may be liable if he knew about a constitutional violation and had the ability to intervene, but failed to do so. *Koutnik v. Brown*, 351 F. Supp. 2d 871, 876 (W.D. Wis. 2004) (citing *Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004)). "However, this rule 'is not so broad as to place a responsibility on every government employee to intervene in the acts of all other government employees.'" *Id.* (quoting *Windle v. City of Marion, Ind.*, 321 F.3d 658, 663 (7th Cir. 2003)). Rather, the failure to intervene must be in "deliberate or reckless disregard" of the inmate's constitutional rights. *Fillmore,* 358 F.3d at 506.

DeMars, McCall, and Voeks reviewed Leiser's medical-related inmate complaints and universally affirmed the decisions of HSU personnel on multiple occasions. The record establishes that each of them investigated Leiser's complaints and deferred to the treatment decisions of HSU staff. Of all the incidents Leiser complains about, three require specific discussion and none requires a trial.

First was Voeks' January 2011 involvement in Leiser's request for a thick mattress due to his degenerative disc disease. Voeks was involved both in the initial decision to reject this

request, as well as the dismissal of Leiser's inmate complaint about it. However, her actions did not amount to either deliberate indifference or failure to intervene. Rather, the record supports the conclusion that Voeks reviewed Leiser's medical records and deferred to Dr. Hannula's January 3 progress note, in which Hannula stated that Leiser appeared to have a good range of motion in his neck, could walk with a cane, and did not display pain behavior. While Leiser claims that Voeks ignored Dr. Hannula's note that he suffers from degenerative disc disease, the DOC's policy permitted thick mattresses for "severe disabling degenerative joint disease," not for *any* type of degenerative disease. Dr. Hannula's notes acknowledged that Leiser had mobility issues, but they also permitted the inference that Leiser was not severely disabled. Accordingly, Voeks' deference to the special committee's decision did not amount to an Eighth Amendment violation.

Second, in July of 2011, Voeks recommended that ICE dismiss Leiser's complaint that he suffered withdrawal symptoms when Dr. Hannula did not renew his prescriptions for cyclobenzaprine and baclofen. (Ex. 1004, dkt. 93-5.) Earlier in this order I concluded that Dr. Hannula's decision to stop Leiser's baclofen prescription without weaning creates an inference that Dr. Hannula was deliberately indifferent. Voeks affirmed that decision. Even though Voeks is a nurse, she made this decision in her capacity as a nursing supervisor. As such, she was entitled to defer to Dr. Hannula's treatment decision. *See Askew v. Davis*, 613 Fed. Appx. 544, 548 (7th Cir. 2015) (holding a nurse to the "standard of a grievance officer, not a medical professional," which permitted her to defer to a treating physician's assessment).

Third, McCall failed to respond to Leiser's May 31, 2013, complaint filed about his testicle pain treatment. Yet McCall has explained that she was no longer employed at SCI when Leiser sent this letter and Leiser has not submitted any evidence to the contrary. As such,

regardless whether Leiser was receiving proper care for his pain, there is no evidence suggesting that McCall knew about this complaint and failed to respond.

Summary judgment in Becher's favor likewise is appropriate. When Becher met with Leiser at SCI in November of 2011, he was performing an audit. After the audit, Leiser directed complaints about his medical care to Becher in letters, but Becher's responsibilities did not include treating inmates on a day-to-day basis. As such, it was appropriate for Becher to direct Leiser to pursue his medical care complaints with the HSU and, if necessary, through the inmate complaint system.

Regardless, qualified immunity protects these defendants from liability under § 1983 because none of their responses violated clearly established federal law when they either did not respond to Leiser's complaints or dismissed them.

## III.    State Law Claims

Leiser is proceeding on malpractice and negligence claims against Dr. Hannula, Bentley, Hazuga, Brunner, Thacker, McCall, DeMars, Voeks and Becher. To prevail on either type of claim in Wisconsin, a plaintiff must prove the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) injury or injuries, or damages. *Paul v. Skemp*, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865 (2001) (*citing Nieuwendorp v. Am. Family Ins. Co.*, 191 Wis. 2d 462, 475, 529 N.W.2d 594 (1995)). Therefore, every claim for medical malpractice and negligence requires a negligent act or omission that causes an injury. *Id.* Defendants seek judgment on both types of claims for different reasons.

A.     **Medical Malpractice**

Defendants argue that because Leiser has neither disclosed an expert nor submitted any evidence contradicting the professional opinions of the defendants, his medical malpractice claims fail as a matter of law. *See Carney-Hayes v. NW Wis. Home Care, Inc.*, 284 Wis. 2d 56, ¶ 37, 699 N.W.2d 524 (2005) ("Medical malpractice cases require expert testimony to establish the standard of care."). I already have concluded that Leiser should have the chance to secure an expert with the help of an attorney with respect to his Eighth Amendment claims; the same is true with respect to Leiser's medical malpractice claims. Nonetheless, while Leiser can still proceed against Dr. Hannula under a medical malpractice theory, I am dismissing his medical malpractice claims against Bentley, Hazuga, Thacker, Brunner, McCall, DeMars, Voeks, and Becher.

In Wisconsin, a plaintiff may sue "health care providers" individually on a theory of medical malpractice. The definition of "health care providers" does not include nurses or nurse practitioners. *See Cooper v. Eagle River Mem'l Hosp., Inc.*, No. 99-C-722-C, 2000 WL 34236737, at *2 (W.D. Wis. 2000) ("the Supreme Court of Wisconsin has held that a nurse practitioner is not a "health care provider" under Chapter 655."); *Patients Comp. Fund v. Lutheran Hosp.-La Crosse, Inc.*, 216 Wis. 2d 49, 573 N.W.2d 572, 575 (Ct. App. 1997) ("nurses employed by a hospital to participate in the care of a hospital's patients, with the exception of nurse anesthetists, are not defined as health care providers"). Because Bentley, Hazuga, Thacker, Brunner, McCall, DeMars, Voeks, and Becher are nurses or nurse practitioners, Leiser has no medical malpractice claim against them.

However, I am denying defendants' motion as to Dr. Hannula. I already explained why her two prescription decisions permit an inference of deliberate indifference, and defendants

have not argued that the other treatment decisions Leiser challenges pass muster under Wisconsin's less rigorous negligence standard. I will not make these arguments for them, so a jury will have to ferret out the merits of Leiser's medical malpractice claims against Dr. Hannula.

### B.    Negligence

Defendants seeks judgment on Leiser's negligence claims because Leiser did not comply with Wisconsin's Notice of Claim statute, Wis. Stat.§ 893.82(3), which requires a plaintiff to file a notice of claim with the Attorney General to commence a suit against a state officer, employee, or agent. This notice is a jurisdictional requirement for state-law claims against state employees. *Ibrahim v. Samore*, 118 Wis. 2d 720, 348 N.W.2d 554, 557-58 (1984). Among other requirements, the statute mandates that the notice of claim include "the names of persons involved, including the name of the state officer, employee or agent involved." Section 893.82(3). Under Wis. Stat. § 893.82(5m), there is an exception to the notice of claim requirement for medical malpractice claims seeking damages, see § 893.82(5m) ("With regard to a claim to recover damages for medical malpractice, the provisions of subs. (3), (3m), and (4) do not apply.").

Leiser's August 26, 2014, notice of claim listed only Dr. Hannula, Bentley, and Hazuga; it did not name Thacker, Brunner, McCall, DeMars, Voeks, or Becher. As such, I am granting defendants' motion and dismissing Leiser's negligence claims against them.

However, I am denying defendants' motion as to Dr. Hannula, Bentley and Hazuga. The negligence claims against Dr. Hannula[5] and Hazuga will proceed to trial for the reasons explained above, but Bentley requires slightly more discussion. Defendants seek dismissal of the negligence claim against Bentley because Leiser has not disclosed an expert who could opine about her specific care decisions. Yet I've already decided not to dismiss Leiser's claims on that basis alone out of deference to Leiser's *pro se* status. While I have concluded that Bentley's treatment decisions did not permit an inference of deliberate indifference, there is room to argue that her claims were negligent. Given that defendants have not submitted any specific arguments to the contrary, Leiser will have an opportunity to present his negligence claims against Dr. Hannula, Bentley, and Hazuga at trial.

---

[5] Defendants have not provided discussion or authority regarding whether, under Wisconsin law, Dr. Hannula can be liable under a theory of negligence for her medical care decisions. I will not make this argument for them. The parties can resolve this issue in their pretrial submissions.

ORDER

1.      Defendants Becher, Bentley, Brunner, DeMars, Hannula, Hazuga, McCall, and

        Voeks' Motion for Summary Judgment (dkt. 81) is GRANTED IN PART and

        DENIED IN PART, in the manner and for the reasons stated in this order.

2.      Defendant Tricia Thacker's Motion for Summary Judgment (dkt. 75) is DENIED.

3.      Defendants' Motion to Strike (dkt. 114) is DENIED.

4.      Leiser's Motion to Compel (dkt. 74), Motion to Object (dkt. 73), and Motion to

        Appoint Expert (dkt. 124) are DENIED.

5.      The remainder of the schedule is STRICKEN. The court will re-set the schedule

        after it has recruited an attorney to assist Leiser.


        Entered this 14th day of September, 2017.


                        BY THE COURT:

                        /s/
                        _____
                        STEPHEN L. CROCKER
                        Magistrate Judge